# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## NEW HAVEN DIVISION

| | | |
|---|---|---|
| In re: | : | Case No.  13-22251 (AMN) |
| SHARON S. BRAINARD, | : | Chapter 7 |
| *Debtor* | : | |
| | : | Re:  ECF Nos. 300, 303[1] |
| | : | |
| MCKEON LAW GROUP, LLC, | : | Adv. Pro. No. 19-2012 (AMN) |
| *Plaintiff* | : | |
| v. | : | |
| SHARON S. BRAINARD, | : | |
| *Defendant* | : | |
| v. | : | |
| BONNIE C. MANGAN, Chapter 7 Trustee, | : | |
| *Defendant.* | : | |
| | : | Re:  AP-ECF No. 9 |

## MEMORANDUM OF DECISION AND ORDER AFTER TRIAL
## ALLOWING PROOF OF CLAIM 1-2 IN PART, AS AN UNSECURED CLAIM, AND
## DENYING THE RELIEF SOUGHT IN COUNTS 1, 2 AND 3 OF THE AMENDED COMPLAINT

### APPEARANCES

| | |
|---|---|
| McKeon Law Group, LLC | Maria McKeon, Esq. |
| 117 Senate Brook Drive | *Counsel for Plaintiff and Claimant* |
| Amston, Connecticut 06231 | |
| | |
| Sharon S. Brainard | Sharon S. Brainard |
| P.O. Box 1990 | *Debtor and Defendant* |
| Vineyard Haven, Massachusetts 02568 | *Proceeding Pro Se* |
| | |
| Bonnie C. Mangan, Esq. | Bonnie C. Mangan, Trustee |
| The Law Office of Bonnie C. Mangan | *Chapter 7 Trustee and Defendant* |
| 1050 Sullivan Avenue, Suite A3 | |
| South Windsor, Connecticut 06074 | |

---

[1]    Documents filed in the Chapter 7 case and in two adversary proceeding cases (case numbers 13-2046 and 19-2012) are referenced as follows:
- In Chapter 7 bankruptcy  case number 13-22251, "ECF No.___";
- in adversary proceeding case number.13-02046, "AP 13-2046, ECF No.___"; and
- in this adversary proceeding case number 19-2012,  simply "AP-ECF No.___".

## Nature of the Proceedings

This case is about a divorce and a break-up.  This decision partially allows a claim by a divorce attorney against her client, as an unsecured claim.

The plaintiff here, McKeon Law Group, LLC and its principal Maria McKeon ("McKeon" or "plaintiff" or "Ms. McKeon") represented Sharon S. Brainard (the "Debtor" or "defendant" or "Ms. Brainard") in the divorce.   Following an April 2013 divorce judgment, the plaintiff continued to provide legal services to the Debtor that included preparing and obtaining court approval of a Qualified Domestic Support Order ("QDRO"). The QDRO required division of the ex-husband's non-qualified pension plan held at Lincoln Financial Group ("Lincoln") and disbursement of approximately 70% of the plan to the Debtor.  Pursuant to the QDRO, Lincoln disbursed $62,362.12 ("Lincoln Funds") to the Debtor in September 2013.  The Debtor did not pay McKeon more than a *de minimis* amount – perhaps a few thousand dollars – for Ms. McKeon's work in the divorce litigation, including the trial and her work to obtain the QDRO.  By September 2013, Ms. McKeon valued her work at more than $70,000.

Immediately before receiving the Lincoln Funds, Ms. Brainard told Lincoln (but not Ms. McKeon) she had terminated Ms. McKeon as her attorney and directed Lincoln to mail the Lincoln Funds to her.  Soon after receiving the Lincoln Funds check, the Debtor spent some of the money.   On October 4, 2013, the Debtor used the balance of approximately $40,000.00 to establish a Fidelity Rollover Individual Retirement Account (the "IRA").[2]  Nine days after the IRA was funded, on October 13, 2013, McKeon filed a UCC-1 financing statement identifying collateral as "Distribution from Lincoln Life

---

[2]    The IRA is subject to an order maintaining the status quo pending the outcome of this litigation. Case No. 13-2046 (AMN), 13-2046 ECF No. 9.

Insurance Company Pension Plan in the amount of approximately $62,362.12 distributed on or about September 13, 2013 to Sharon Brainard".[3]

The break-up between the attorney and the client that followed this chain of events resulted in the present dispute over attorney's fees and whether the attorney holds a secured or unsecured claim.

On October 31, 2013 ("Petition Date"), the Debtor filed a voluntary Chapter 7 bankruptcy petition commencing the underlying Chapter 7 case, listing McKeon as an unsecured creditor, holding a disputed claim for $70,000.[4]  After the Petition Date, the Debtor spent funds from the IRA (which is the subject of past and future orders regarding its ultimate disposition), and the IRA balance is now approximately $30,000.  McKeon filed proof of claim 1-2 ("POC 1-2") in the Chapter 7 case asserting the law firm is owed $83,248.00 for attorney's fees and pre-petition interest, of which $62,362.12 is secured and $20,866.00 is unsecured.[5]

In Counts 1, 2 and 3 of the Amended Complaint dated September 13, 2019,[6] McKeon seeks to establish it held an assignment of, or a lien against, the Lincoln Funds and the IRA.  Because the Debtor earned a bankruptcy discharge years ago, the only source of payment for McKeon's claim (if allowed but merely unsecured) is whatever the estate holds, possibly including the IRA.[7]

The Debtor and the Trustee object to POC 1-2 for different reasons, with both challenging the secured status of the claim. [8]  The Debtor also objects to allowance of

---

[3]     *See* AP-ECF No. 147; AP 13-2046, ECF No. 92-2.
[4]     ECF No. 1, p. 20.
[5]     There is no explanation of the small difference in the sum of these two numbers ($83,228.12) and the total amount claimed ($83,248.00).
[6]     AP-ECF No. 9.
[7]     ECF No. 100
[8]     ECF Nos. 300, 303.

McKeon's claim in any amount.  McKeon advances three theories in the quest to establish a secured claim against the funds in the IRA, arguing in the alternative:

(1) McKeon holds an assignment of the Lincoln Funds and the assignment is enforceable against the IRA; or,

(2) McKeon holds an enforceable security interest against the IRA under the Uniform Commercial Code; or,

(3) McKeon holds an attorney's charging lien in the amount of $3,234.00[9] for the portion of attorney's fee earned after the date of the divorce judgment that may be enforced against the IRA.

After a 2021 trial, the court now addresses whether and to what extent McKeon holds an allowed claim, and, if so,  whether any of it is secured.

The trial on the Amended Complaint and the evidentiary hearing on the objections to POC 1-2 were consolidated and held over five (5) trial days took place in the midst of the COVID-19 pandemic using the ZoomGov video conference platform.  The audio record of the proceedings is docketed and transcripts were ordered.[10]  No video recording was created by the court or permitted.

## I.    JURISDICTION AND VENUE

This court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 1334(b) and 157(a),157(b)(2)(A), (B), and (K), and the United States District Court for the District of Connecticut's General Order of Reference dated September 21, 1984.  This is a core proceeding.  Venue is properly before this court in this District pursuant to 28 U.S.C. §§ 1408(1) and 1409(a).  This memorandum constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, applicable here pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

---

[9]    AP-ECF No. 413, p. 16.
[10]    AP-ECF Nos. 136-140.

## II.    BURDENS OF PROOF AND APPLICABLE LAW

### A. Burdens of Proof

#### 1)  Shifting Burden of Proof When Proof of Claim is Contested

A timely filed proof of claim is *prima facie* evidence of the claim's validity and amount.  Fed.R.Bankr.P. 3001(f).  Upon the filing of a proof of claim and in the absence of an objection, a claim is deemed allowed. 11 U.S.C. § 502(a).[11]  To prevail on an objection to a proof of claim, the objecting party must "produce evidence at least equal in probative force" to evidence offered by the claimant to "refute at least one of the allegations that is essential to the claim's legal sufficiency."  *In re Hampton Ventures, LLC*, 599 B.R. 474, 488 (Bankr. D. Conn. 2019) (*quoting, In re Driscoll*, 379 B.R. 415, 420 (Bankr. D. Conn. 2008)).  "If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence."  *Hampton Ventures*, 599 B.R. at 488 (*quoting, In re Vanegas*, 290 B.R. 190, 193 (Bankr. D. Conn. 2003)).

#### 2)  Claimant Bears the Burden of Proof on a Claim for Attorney's Fees

Under Connecticut law, the burden of proving the reasonableness of attorney's fees rests with the moving party and the fee application must have sufficient evidentiary support to provide the non-moving party with a reasonable opportunity to object. *Pena v. Gladstone*, 168 Conn. App. 141, 170 (2016) (*citing Smith v. Snyder*, 267 Conn. 456, 479 (2004)).  Connecticut courts require an appropriate evidentiary showing to establish the reasonableness of attorney's fees and costs.  *Bank of America, N.A. v. Malkin*, 2018 WL 624636, *4 (D. Conn. Jan. 30, 2019) (*citing Smith,* 267 Conn. at 471)).

---

[11]    Unless otherwise stated, statutory references throughout are to the Bankruptcy Code found at Title 11, United States Code.

The fee applicant must submit documentation to meet its "burden of establishing entitlement to an award." *Fox v. Vice*, 563 U.S. 826, 838–39 (2011). The applicant must "at least identify the general subject matter of his [or her] time expenditures," and in the absence of such identification, a court may not award fees based on those entries. *Strauch v. Computer Sciences Corp.*, 2020 WL 4289955, *4 (D. Conn. July 27, 2020) (*quoting Electro-Methods, Inc. v. Adolf Meller Co.*, 473 F. Supp. 2d 281, 305–06 (D. Conn. 2007)). The goal is to do "rough justice," not to achieve auditing perfection. *Fox*, 563 U.S. at 838.

### 3)  Burden of Proof Regarding Assignment

It is an assignee's burden – here, McKeon – to prove the existence of an assignment. *Cuda & Associates, LLC v. Lumpkin*, 2011 WL 6413674 (Conn. Super. Ct. Nov. 29, 2011). The burden may be met " 'by evidence that is satisfactory in character to protect the [account debtor – here, Lincoln] from another action by the alleged assignor [here, Ms. Brainard], and which shows that there was a full and complete assignment of the claim from an assignor who was the real party in interest with respect to the claim.'" 6A C.J.S. Assignments § 147.

### 4)  Burden of Proof Regarding Perfected Security Interest

The plaintiff – here McKeon – bears the burden of proof to establish a perfected lien under the Uniform Commercial Code. *Platinum Funding Services, LLC v. Magellan Midstream Partners, Ltd. Partnership*, 2010 WL 2383786, at *3 (Conn. Super. Ct. Apr. 30, 2010); *Joseph V. Discala 1997 Trust v. Sal-Sue Bran, Inc.*, 2007 WL 1532308, *2 (Conn. Super. Ct. May 14, 2007).

### B. Applicable Law

#### 1) Bankruptcy Proof of Claim

Section 502(b) of the Bankruptcy Code requires (with inapplicable exceptions) that a court, "shall determine the amount of [a] claim in lawful currency of the United States as of the date of the filing of the petition and shall allow such claim in such amount." 11 U.S.C. § 502(b).  The Supreme Court recognized, "[p]roperty interests are created and defined by state law," and "[u]nless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Travelers Cas. and Sur. Co. of America v. Pacific Gas and Elec. Co.,* 549 U.S. 443, 451 (2007) (*quoting Butner v. U.S.,* 440 U.S. 48, 55 (1979)).  Here, Connecticut state law applies to the determination of the amount and nature of the claim alleged in McKeon's POC 1-2.

#### 2) Connecticut's Method for Calculating Reasonable Attorney's Fee

Under Connecticut state law, the initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate.  *Sclafani Properties, LLC v. Sport-N-Life Distributing, LLC,* 198 Conn. App. 292, 302-03 (2020).  "This is consistent with caselaw from the circuit and Supreme Court, which 'have held that the lodestar—the product of a reasonable hourly rate and the reasonable number of hours required by the case—creates a presumptively reasonable fee.'"  *Cumulus Broadcasting v. Okesson*, 2012 WL 3822019, at *4 (D. Conn. Sept. 4, 2012) (*quoting Millea v. Metro-North R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011))(*internal quotation marks and citations omitted*).

After determining a lodestar calculation, a court may then adjust it by applying twelve factors outlined in a 5th Circuit decision, *Johnson v. Georgia Highway Express,*

*Inc.,* 488 F.2d 714, 717-19 (5th Cir. 1974).  The twelve factors, essentially paralleling Rule

1.5(a) of the Rules of Professional Conduct, are:

> (1) the time and labor required;
> (2) the novelty and difficulty of the questions;
> (3) the skill requisite to perform the legal service properly;
> (4) the preclusion of other employment by the attorney due to acceptance of the case;
> (5) the customary fee for similar work in the community;
> (6) whether the fee is fixed or contingent;
> (7) the time limitations imposed by the client or the circumstances;
> (8) the amount involved and the results obtained;
> (9) the experience, reputation and ability of the attorneys;
> (10) the undesirability of the case;
> (11) the nature and length of the professional relationship with the client; and
> (12) awards in similar cases.
> *Sclafani Properties, LLC,* 198 Conn. App. at 302-03 (*citing Johnson v. Georgia Highway Express, Inc.,* 488 F.2d at 717-19).

While the *Johnson* factors may be relevant in adjusting the lodestar amount, "no

one factor is a substitute for multiplying reasonable billing rates by a reasonable

estimation of the number of hours expended on the litigation."  *Dickau v. Mingrone*, 2021

WL 3141298, *4 (Conn. Super. Ct. June 28, 2021); *Miller & Chabb v. Alladin*, 2020 WL

4931295, *4 (Conn. Super. Ct. July 29, 2020).  The *Johnson* factors are substantially

similar to a standard set forth in the Connecticut Rules of Professional Conduct.  Rules

of Prof. Conduct, Rule 1.5.

### 3)  Establishing the Existence of an Assignment

"A valid assignment transfers to the assignee exclusive ownership of all of the

assignor's rights to the subject assigned and extinguishes all of those rights in the

assignor." *Mall v. LaBow*, 33 Conn. App. 359, 362 (1993); *Bouchard v. People's Bank*,

219 Conn. 465, 473 (1991).  Generally, "to constitute an assignment there must be a

purpose to assign or transfer the whole or a part of some particular thing, debt, or chose

in action, and the subject matter of the assignment must be described with such

particularity as to render it capable of identification." *Schoonmaker v. Lawrence Brunoli, Inc.*, 265 Conn. 210, 227 (2003) (*quoting Dysart Corp. v. Seaboard Surety Co.*, 240 Conn. 10, 17 (1997)). However, "[n]o words of art are required to constitute an assignment; any words that fairly indicate an intention to make the assignee owner of a claim are sufficient ..." 29 S. Williston, Contracts (4th Ed.2003) § 74:3, p. 219; *Sunset Gold Realty, LLC v. Premier Bldg. and Development, Inc.*, 133 Conn. App. 445, 452–53 (2012) (combination of evidence satisfied particularity requirement of assignment).

### 4) Establishing the Existence of a Security Interest

Whether an agreement creates a lien depends on applicable state law. *In re Lozier*, 2018 WL 2176280, \*3 (Bankr. D. Conn. May 10, 2018) (citing *Butner,* 440 U.S. at 55)). In Connecticut, Article 9 of the Uniform Commercial Code ("UCC") was adopted and is codified at General Statutes § 42a-9-101 *et seq.*, to govern secured transactions, including the attachment, perfection, priority, and enforceability of a security interest.

For a security interest to be enforceable and attach to collateral under Connecticut law, (1) the secured party must have given value; (2) the debtor must have obtained rights in the collateral; and (3) the debtor must have signed a written security agreement that describes the collateral." *Cornerstone Community Credit Union v. Lee & Mason Financial Services, Inc.*, 2021 WL 5862499, \*4 (Conn. Super. Ct. Nov. 16, 2021) (*quoting State v. Kurrus*, 2011 WL 3199469, \*1 (Conn. Super. Ct. June 23, 2011) (*citing* Conn. Gen. Stat. § 42a–9–203)).

"Value" is defined broadly under § 42a-1-204 and can be established when a party received rights "for a binding commitment to extend credit ... as security for, or in total or partial satisfaction of, a preexisting claim," or gave "consideration sufficient to support a simple contract." *Dealer Services Corp. v. American Auto Auction, Inc.*, 2010 WL

1006150, *8 (Conn. Super. Ct. Feb. 8, 2010).  A debtor has rights in collateral to grant a creditor a security interest in the collateral by being its owner or upon consent from the owner.  *Bevans v. Stuart*, 2001 WL 617191, *2 (Conn. Super. Ct. May 14, 2001) (*citing Matter of Whatley*, 874 F.2d 997, 1004 (5th Cir.1989)).

An "agreement means the bargain of the parties in fact as found in their language or by implication from other circumstances…."  *Fantry v. Medical Capital Corp.*, 2002 WL 172708, *2 (Conn. Super. Ct. Jan. 4, 2002) (citing *Walter E. Heller & Co., Inc. v. Salerno*, 168 Conn. 152, 157–58 (1975)).  A "'security agreement' means an agreement that creates or provides for a security interest."  Conn. Gen. Stat. § 42a–9–102(74).  To "authenticate" an agreement means, sign, execute, or "otherwise adopt a symbol or encrypt or similarly process a record in whole or in part, with the present intent of the authenticating person to identify the person and adopt or accept a record."  *See*, Conn. Gen. Stat. § 42a-9-102(a)(7).

Several documents signed by a debtor, may, taken together, constitute the execution of a security agreement.  *In re S.O.M.B., Inc.*, 1995 WL 542512, *1 (Bankr. D. Conn. 1995).  "The typical security agreement is labeled "security agreement," but unorthodox documents labeled 'collateral pledge,' 'security assignment,' or 'title retention agreement' are also likely to be recognized as adequate security agreements. Indeed, agreements without a trace of security agreement terminology . . . qualify as security agreements."  4 White, Summers, & Hillman, Uniform Commercial Code § 31:4 (6th ed.).

When a party neglects to sign a separate security agreement, the transaction must be examined as a whole to determine if there is a writing, or writings, signed by the debtor describing the collateral which demonstrates an intent to create a security interest in the collateral.  *In re S.O.M.B., Inc.*, 1995 WL 542512 at *2 (*citing In re Bollinger Corp.*, 614

F.2d 924, 928 (3d Cir. 1980); *see also Laurel Bank and Trust Co. v. Mark Ford, Inc.*, 182 Conn. 437, 439 (1980) (concluding multiple authenticated writings considered as a whole were sufficient to constitute the execution of a security agreement)).

Without an authenticated security agreement, the secured transaction between debtor and creditor fails the third test for enforceability under § 42a-9-203(b); therefore, the security interest(s) does not attach.   4 White, Summers, & Hillman, Uniform Commercial Code § 31:4 (6th ed.) (*citing In re Jojo's 10 Restaurant, LLC,* 455 B.R. 321, 74 U.C.C. Rep. Serv. 2d 441 (Bankr. D. Mass. 2011)).   When there is no writing authenticated by the debtor, parol evidence is admissible.  4 White, Summers, & Hillman, Uniform Commercial Code § 31:4 (6th ed.)

### 5)  Perfecting a Security Interest in Proceeds

Attachment and perfection are two distinct concepts under the UCC.  *Kurrus*, 2011 WL 3199469 at *1; *In re Shoreline Elec. Supply, Inc.*, 1975 WL 22903, *235 (D. Conn. 1975).  "Attachment deals with the enforceability of a security interest against the debtor, while perfection deals with the issues of priority and enforceability of that interest against other creditors of the debtor who have claims to the same collateral."  *Kurrus*, 2011 WL 3199469 at *1 (*citing* Conn. Gen. Stat. § 42a–9–203).  There is no requirement that the security agreement and the financing statement be completed contemporaneously.  *In re Shoreline Elec. Supply, Inc.*, 1975 WL 22903 at *235.

Under UCC Article 9, "cash proceeds" means proceeds that are money, checks, deposit accounts or the like" (Conn. Gen. Stat. § 42a-9-102); "a security interest in money may be perfected only by the secured party's taking possession"  (Conn. Gen. Stat. § 42a–9–313); and, "a security interest in proceeds is a perfected security interest if the

11

security interest in the original collateral was perfected" (Conn. Gen. Stat. § 42a–9–315(c)).

### 6) Perfecting a Security Interest in Deposit Accounts

A security interest in bank or deposit accounts may only be perfected by obtaining "control" over those funds. Conn. Gen. Stat. § 42a–9–314(a).  "Control" occurs when the bank itself is the secured party, there is a properly authenticated agreement among the debtor, secured party and bank, or the secured party becomes a customer of the bank with regard to the deposit account at issue.  Conn. Gen. Stat. § 42a–9–104(a).

### 7) Perfection By Filing A UCC-1 Financing Statement

The filing of a UCC-1 financing statement against a debtor does not, in and of itself, create a secured claim.  Rather, the "primary purpose of a Financing Statement is to provide notice to the public of a security interest in the debtor's property."  *PaineWebber Inc. v. Nwogugu*, 1998 WL 193110, *4 (S.D.N.Y. Apr. 22, 1998); *see also General Ins. Co. of America v. Mezzacappa Bros., Inc.*, 110 F. App'x 184, 185 (2d Cir. 2004).  Thus, when a creditor presents a standard financing statement to establish a valid and enforceable security interest, "there must be some further documentation corroborative of the debtor's intent to pledge collateral."  *In re Modafferi*, 45 B.R. 370, 372 (S.D.N.Y. 1985); *see also In re K-V Discovery Sols.*, 2013 WL 501721, *4 (Bankr. S.D.N.Y. Feb. 11, 2013) ("[A] financing statement cannot expand a security interest beyond that which is granted in the security agreement.")).

To perfect a security interest that has attached to some types of collateral, such as proceeds, a UCC-1 financing statement must be filed.  Under § 42a–9–502(a), a financing statement is sufficient only if it provides the names of the debtor and the secured party or its representative, and, describes the collateral.  Conn. Gen. Stat. § 42a–9–502(a).  The

current version of UCC Article 9 does not require a debtor's signature on a financing statement in order to facilitate paperless filings.   Conn. Gen. Stat. § 42a–9–502(a), Comment 3.

UCC section § 42a–9–509 (Persons entitled to file a record) now provides, "a person may file an initial financing statement … only if the debtor authorizes the filing in an authenticated record" as described in that section.  Essentially, under § 42a–9–509(b), "the authentication of a security agreement *ipso facto* constitutes the debtor's authorization of the filing of a financing statement covering the collateral described in the security agreement. The secured party need not obtain a separate authorization."  Conn. Gen. Stat. § 42a–9–509, Comment 4.

### 8)  Charging Liens and Marital Assets

In Connecticut, "[t]he concept of an attorney's charging lien is rooted in common law and is founded on the equitable right of an attorney to recover … fees and costs due … for … services out of the judgment … obtained.  Thus, an attorney's charging lien does not merely give the attorney an enforceable right against the property of another, but rather it gives the attorney an equitable ownership interest in the client's cause of action, and the client's property right in his or her own cause of action is only what remains after transfer to the attorney of the attorney's agreed-on-share…."  *Olszewski v. Jordan,* 315 Conn. 618, 624 (2015).

"A charging lien may be created in two ways. First, as an equitable remedy, the lien arises merely by virtue of the client's recovery of money due to the attorney's efforts ... Second, the charging lien may be created by agreement, which may be oral, between the attorney and the client allowing the attorney to take his or her fee from the proceeds recovered."  *Schools v. Lee*, 2019 WL 6745733, *3 (Conn. Super. Ct. Nov. 8, 2019)

(*quoting Intercity Development, LLC v. Rose,* 2010 WL 1006098, *3 (Conn. Super. Ct. Feb. 11, 2010)).

However, in *Olszewski*, the Connecticut Supreme Court clarified, "[a]ttorneys are not entitled by operation of law to equitable charging liens on marital assets for fees and expenses incurred in obtaining judgments for their clients in marital dissolution proceedings in Connecticut."   *Olszewski,* 315 Conn. at 637.   The *Olszewski* court observed that permitting an attorney to obtain an equitable charging lien "would interfere with the 'carefully crafted mosaic' created by the balancing and distribution of the parties' financial assets in marital dissolution actions ... Indeed, one of the chief risks of allowing an equitable charging lien in a marital dissolution action is that lien could deplete the parties' financial assets to such an extent that there would be little or nothing left for the other purposes the mosaic was intended to advance, such as a child's support or future educational expenses." *Olszewski,* 315 Conn. at 629-30.

### 9)  Rule 1.8, Rules of Professional Conduct

As relevant here, the Connecticut Rules of Professional Conduct, Rule 1.8(a) provides:

> (a)  A lawyer shall not enter into a business transaction, including investment services, with a client or former client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client or former client unless:
>
> > (1)  The transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client or former client and are fully disclosed and transmitted in writing to the client or former client in a manner that can be reasonably understood by the client or former client;
> >
> > (2)  The client or former client is advised in writing that the client or former client should consider the desirability of seeking and is given a

>        reasonable opportunity to seek the advice of
>        independent legal counsel in the transaction;
>
> (3)    The client or former client gives informed
>        consent in writing signed by the client or former
>        client, to the essential terms of the transaction
>        and the lawyer's role in the transaction,
>        including whether the lawyer is representing
>        the client in the transaction; . . . .

Rules of Professional Conduct, Rule 1.8(a).

"The public policy underlying rule 1.8 is to prevent conflicts of interest between attorney and client.   According to the scope of the Rules of Professional Conduct, the rules are not designed to augment the attorney's legal duty and are provided to guide disciplinary agencies in regulating attorneys' actions." *MH Investors, LLC v. CT Financial Partners, LLC*, 2017 WL 3881018, *5 (Conn. Super. Ct. July 20, 2017) (holding that while obtaining a mortgage to pay attorney's fee in a non-marriage dissolution action violated the Rules of Professional conduct, the motive was not improper or unjustifiable or otherwise malicious to serve as the basis for invalidating the agreement based on public policy)); *But see Barr v. Barr*, 2015 WL 4098067,*10 (Conn. Super. Ct. June 2, 2015) (holding that an attorney for a party in a dissolution action who acquires a mortgage on property in the marital estate to secure payment of his fees has an impermissible proprietary interest in the subject matter of the litigation, in violation of Rule of Professional Conduct 1.8(i)).

### 10) *Pro Se* Litigants

Courts should afford a *pro se* litigant deference since they lack both legal training and experience, but this does not exempt a *pro se* litigant from compliance with procedural rules. *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010); *Lewis v. Cavanaugh*, 2019 WL 340742, *4 (D. Conn. Jan. 28, 2019).

### III.    PROCEDURAL BACKGROUND AND FACTS

## A. The Divorce Proceedings

### 1)    Divorce Case Background

#### a.  Initial Selection of Counsel

The Debtor met Maria McKeon when she was seeking to employ a lawyer to represent her during her divorce case from her now ex-spouse, Peter B. Brainard, Jr. ("Peter" or the "ex-husband").  At the time, the Debtor was struggling to pay her bills, the marital home was in foreclosure and she worked at a Pottery Barn store where she earned about $192 a week.[12]  The Debtor previously received cash assistance from the State of Connecticut and received food stamps for herself and her two children.[13]   Upon investigation, it should have been clear the Debtor had a limited ability to pay an attorney.

#### b.  The Divorce Judgment

Given Peter's previous salary ($52,000) at his most recent job, his educational, and business acumen as a financial planner, the divorce court attributed to Peter an annual gross earning capacity of $75,000, while attributing an earning capacity to the debtor of $20,000 per year.[14]  The Debtor did not have any retirement assets and most of Peter's retirement assets were used to pay living expenses.[15]   However, he owned a non-qualified pension plan valued at $87,232.53 with Lincoln Financial Group ("Lincoln").  On April 5, 2013, the state court entered a divorce decree awarding the debtor seventy percent (70%) of Peter's non-qualified pension plan valued at $87,232.53 with Lincoln, which amounted to $62,362.12 ("Lincoln Funds").[16]   The state court also held Peter in

---

[12]     ECF No. 364-48.
[13]     *Id.*
[14]     *Id.*
[15]     *Id.*
[16]     ECF No. 364-48, p. 12.

contempt of its prior orders for not paying child support and alimony, ordered him to pay $1,500 in legal fees to the Debtor, ordered that the costs of preparing the QDRO would be divided equally, and, ordered that the parties were otherwise responsible for their respective legal fees and costs incurred in connection with divorce case.

### c. The Retainer Agreement

While Ms. Brainard sought to hire McKeon in mid-March 2012, it wasn't until on or about February 25, 2013 – close to the beginning of the divorce trial -- that the parties executed a retainer agreement ("Agreement") regarding the divorce case.[17]    Before signing the Agreement, Ms. Brainard communicated to McKeon through an email that she was not able to pay the retainer fee.[18]    According to Section 2 of the Agreement, Ms. Brainard was to pay "[a]n advance payment of [the] fees in the amount of $5,000," before McKeon would began representing her.[19]    Since Ms. Brainard did not have money to pay the retainer fee, Ms. McKeon informed her that, "[i]f [Ms. Brainard] wanted to try and get attorney's fee from the [state court], she could file a motion to ask for attorney's fee[]."[20]    Thereafter, Ms. Brainard emailed Ms. McKeon on June 15, 2012, and attached "[a] motion that [debtor] filed with [the state court], where she was asking for attorney's fee[]."[21]

Ms. McKeon and Ms. Brainard discussed the possibility the state court would deny the attorney's fee motion.    Ms. McKeon testified she told Ms. Brainard, "we'll need to discuss whether I will be able to stay on . . . as your attorney if you're not able to obtain funds for the retainer."[22]    However, when the state court denied the attorney's fee motion, McKeon testified she then agreed with Ms. Brainard that "she would pay me -- she was

---

17    ECF No. 364-11.
18    ECF No. 364-74; AP-ECF No. 136, p. 13, ln 6-10.
19    ECF No. 364-11.
20    ECF No. 364-74; AP-ECF No. 136, p. 13, ln 6-10.
21    ECF No. 364-74; AP-ECF No. 136, p. 11, ln 19-23, and p. 13, ln 5-19.
22    ECF No. 364-74; AP-ECF No. 136, p. 15, ln 9-13.

working a job and she would pay me as she went along, and she would keep making payments to me and depending on, you know, how she did in the divorce, she would pay me more or less, depending on how things turned out, but there was an obligation for her to pay and make payments to me".[23]

Section 6 of the Agreement entitled 'Rates and Disbursements' outlined McKeon's hourly rate for services at $300.00 per hour, which McKeon testified "[t]hat's less than I normally charge, but I was giving her a lower rate."[24]  Section 8 of the Agreement entitled Itemized Billings outlined that the "[L]aw Firm will send [client] monthly itemized bills."[25] However, Ms. McKeon and Ms. Brainard disagree on whether McKeon sent monthly itemized bills.  There is no credible evidence supporting a conclusion that monthly bills were sent prior to the dispute over the Lincoln Funds.

The court notes the Agreement has three separate sections entitled "Section 3", including one relevant here entitled "Discharge and Withdrawal."  The "Discharge and Withdrawal" section allowed McKeon to seek to withdraw her appearance in state court if Ms. Brainard failed to make timely payment(s).[26]  Although Ms. McKeon claims "[t]he total amount [Ms. Brainard] paid me for the entire divorce over the year and a half was about $350," the attorney did not move to withdraw her appearance from the debtor's divorce case until October 2, 2013.[27]  A section entitled "Interest" indicated Ms. Brainard would "[b]e charged interest at a yearly rate of 18% on any balance due that is not paid within 30 days from the date of the bill."[28]

---

[23]    AP-ECF No. 136, p. 16, ln 4-10.
[24]    ECF No. 364-11; AP-ECF No. 136, p. 18, ln 1-3.
[25]    ECF No. 364-11, p. 3-4.
[26]    ECF No. 364-11.
[27]    AP-ECF No. 136, p. 50, ln 1-4 and p. 59, ln 20-22.
[28]    ECF No. 364-11.

The court credits each party's belief about how the financial agreement between lawyer and client was to work. Ms. McKeon strongly believed she would be paid from assets she would uncover during the divorce proceedings, or from cash flowing to Ms. Brainard as a result of the divorce litigation. Similarly, Ms. Brainard strongly believed Ms. McKeon would "fight" for her and that – somehow – she would not have to pay the attorney's fees. This was notwithstanding Ms. McKeon's work for numerous hours to conduct investigation, negotiation, discovery or trial, and notwithstanding the terms of the written engagement letter and financial statements Ms. Brainard submitted to the divorce court showing large sums due and owing to the McKeon firm. In hindsight, it seems clear these assumptions – on both sides – about payment arrangements were unfounded.

### d. McKeon's Demands for Payment

McKeon sent Ms. Brainard numerous emails throughout and after the divorce case requesting payment of attorney's fees.[29] McKeon claimed the Debtor was mostly unresponsive.[30] Prior to the two-day divorce case trial, McKeon claimed Ms. Brainard owed her well in excess of $47,000.[31] By the end of the divorce case trial, the bill had grown to approximately $68,000.[32]

McKeon acknowledged she was not concerned with where or how the Debtor obtained the funds to pay her. Instead, she was only concerned with being paid:

> **McKeon:** So, Ms. McKeon, what was your discussion with regard to payment out of the retirement funds with Ms. Brainard?

> **McKeon:** And my answer is at no time did we discuss that she would pay me out of the retirement funds. It was just she needed to pay me. Whether she paid me out of her Pottery Barn money, her alimony and

---

[29]    AP-ECF No. 137, p. 34, ln 12-20.
[30]    *Id.*
[31]    ECF No. 364-53.
[32]    AP-ECF No. 137, p. 50, ln 1-2.

child support, or her retirement assets, I didn't really care. I just
needed to get paid.[33]

### e. The QDRO

Despite the lack of payment, Ms. McKeon continued providing legal services by preparing the QDRO after the divorce case because she felt the QDRO funds would provide a source of payment for her legal fees:

> **McKeon:** And, Ms. McKeon, did you finally decide to go after the Lincoln money?

> **McKeon:** And my answer is yes. I realized that she was not going to pay me in any other fashion, so I said to her, you know, I would agree to go after […] Lincoln to pay my bill. And, you know, that she was, you know, giving me that order to do that, to get my payment from Lincoln.[34]

In the draft QDRO, McKeon named the debtor as the alternate payee and obtained the state court's approval to the form of the order on July 23, 2013.[35]  On or about September 3, 2013, McKeon submitted the signed QDRO to Lincoln.[36]  Thereafter, Lincoln issued the Lincoln Funds in the form of a check in the amount of $62,362.12 made payable to Sharon Brainard and mailed it directly to Ms. Brainard rather than to Ms. McKeon.[37]  McKeon introduced no evidence that any instructions based upon the Law Firm's alleged assignment of or security interest in the Lincoln Funds, or its proceeds, were given to Lincoln as to the proper disposition and disbursement of the Lincoln Funds. In fact, Lincoln's actions suggest that no such instructions or claims were ever made by McKeon.

---

[33]    AP-ECF No. 137, p. 40, ln 2-8.
[34]    AP-ECF No. 137, p. 55, ln 3-9.
[35]    ECF No. 364-62 and ECF No. 364-75.
[36]    ECF No. 364-56, p. 3.
[37]    ECF No. 364-75.

When asked why the funds were sent to the alternate payee (the debtor) and not to the lawyer, Ms. McKeon testified that comported with the state court's order.

**The Court:** It's an order of -- right, it's called a QDRO. It's an order of the Court.

**McKeon:** Right.

**The Court:** Does it allow -- does it allow Lincoln to issue a check to anyone other than the alternate payee?

**McKeon:** No. It doesn't -- it doesn't even address that. It's not -- it's standardly not dealt with that way. It's because -- under the terms of the plan, under the terms of the Court order, it's payable to the -- one of the parties, either the husband or the wife. [38]

### f. Emails Regarding the Lincoln Funds

Ms. McKeon testified Ms. Brainard had assigned the Lincoln Funds to the McKeon law firm based on emails or email exchanges.

---

[38]    AP-ECF No. 137, p. 77-79.  Ms. McKeon further testified:

**The Court:**  Okay. So I'm not clear on your testimony then that frequently it's paid to the attorney.
**McKeon:**  Oh, so what they'll do in these QDROs is when the attorney completes the QDRO, the payment will be made -- the check will be sent to the attorney. And it's --
**The Court:** But who is the check made payable to when that happens?
**Ms. McKeon:** If the check is made payable to the client, it will be deposited in the client's secured interest account. So whether the check is made payable to the attorney -- it depends on how they – every company is different in how they issue the check. But they'll either issue the check to the -- in the attorney's name on behalf of the client or directly to the client. . . . And so either way you would –- the attorney would deposit it in their IOLTA account and then issue the check directly to the client or however the check is to be distributed.
**The Court:**  Well, if the check is sent to the attorney that's made  payable to the client, doesn't the client need to endorse it?
**Ms. McKeon:**  No. I've had a number of cases where the -- where the check is -- if it's made payable to the client and you deposit it in your IOLTA account the obligation is that it goes into the client's account. It's on the -- you know, for the benefit of client.
**The Court:**  How do you do that? . . . how do you deposit that with a financial institution, a check made payable to someone else, into your IOLTA account?
**Ms. McKeon:** It happens all the time. I just finished a case where the judge ordered a whole bunch of IRS checks, refund checks to be held by me on behalf –
**The Court:** That was pursuant to a court order?
**Ms. McKeon:** Yeah. Whether it was a court order or not. But in this case I was just referring to, yeah, the judge just said, you know, the attorney will hold the check in their IOLTA.
**The Court:** Okay. Okay. Well, it didn't happen in this case, right? You didn't receive a check from Lincoln as things turned out, is that right?
**Ms. McKeon:** That is correct.
***Id.***

**Ms. McKeon:** And, Ms. McKeon, when you went forward and had the discussions with Lincoln about the QDRO, why did you do that?

**Ms. McKeon:** And my answer is I did it because Sharon Brainard had been saying to me in a number of emails that was my payment and that was how I was going to get my payment. And I was reaffirming it to her in the email of July 8th. I reaffirmed it to her in the letter of exhibit 55. And at no point did she ever say not to do it. So I was believing this was my way to get payment because she had told me that's how I was to get my payment. So in my mind, she had assigned it to me and that's why I was getting payment on it. And that's why I was doing the work with it.[39]

. . .

**Ms. McKeon:** Exhibit 72 has a June 4th email. It has a June 3rd email. And several June 3rd emails. It has emails from -- another email from June 4th. It's got another email from June 4th and the July 8th email.[40]

On June 3, 2013, Ms. Brainard responded in an email to Ms. McKeon's repeated request for payment of the outstanding fees by stating, "I thought we had already discussed the money due to me regarding the 401k/retirement fund that I was awarded. I discussed thus[sic] with you repeatedly because this was whee[sic] I would get the bulk of payment to you.i[sic] thought you had already started. I stated this during trial and after…."[41]

On June 4, 2013, at 1:48 p.m., Ms. Brainard again responded in an email to Ms. McKeon's request for payment by stating, "[t]he last time we were in court it was $47,000. with [sic] a comment by you that it would not be nearly that amount. Why don't you go after Lincoln and keep the amount allotted for me and the children for yourself."[42]  Later that same day, at 6:48 p.m., Ms. Brainard further responded, "[a]s I said, go after Lincoln. My families [sic] share should pay your bill, but whether or not you do, as I stated, when my IRS comes in you will receive it and half of whatever Peter gives me."[43]

---

[39]    AP-ECF No. 137, p. 71, ln 1-13; ECF No. 364-54.
[40]    AP-ECF No. 137, p. 147, ln 10-15.
[41]    ECF No. 364-53.
[42]    ECF No. 364-54 and ECF No. 364-72, p. 5.
[43]    ECF No. 364-54 and ECF No. 364-72.

In a July 8, 2013 email to Ms. Brainard, Ms. McKeon stated, "You have made several statements that I should take the money from the pension payment that the court ordered under the divorce decree. Pursuant to your instructions, I will take my payments from any pension payments that may be paid from his non-qualified pension provided the payments are not delayed until the time frame that Peter originally elected payments to begin."[44]  The record does not include a written response to this email from Ms. Brainard.

Ms. McKeon acknowledged she did not advise the debtor to seek independent legal counsel before allegedly assigning her interest in the Retirement Distribution Funds or before allegedly granting McKean a security interest under the Uniform Commercial Code.

> **Trustee:** At any point in time before you [agreed to take an assignment of the Retirement Distribution Funds], did you inform your client or then former client that she had the ability or the desirability to go and get independent legal counsel about her -- before she assigned those rights to you?
>
> **McKeon:** No.[45]

### g.  Filing of a UCC-1 Statement and the McKeon Lawsuit

On October 3, 2013, McKeon commenced suit against the debtor in the Superior Court.[46]  Days later, on October 13, 2013, Ms. McKeon filed a UCC-1 financing statement purporting to perfect the law firm's alleged security interest:

> **Ms. McKeon:** Can you tell the Court why you filed the UCC financing statement?
>
> **Ms. McKeon:** And my answer is is when I found out that Ms. Brainard had disconnected -- had claimed she terminated me to Lincoln and that she had taken the check, I knew I needed to take action to perfect my

---

[44]    ECF No. 364-54 and ECF No. 364-72.
[45]    AP-ECF No. 137, p. 161, ln 1-7.
[46]    See, *McKeon Law Group, LLC v. Sharon Brainard*, Case No. HHD-CV-13 6045758-S (the "McKeon Lawsuit").

security interest in the property and so I filed the UCC statement to show that I had a security interest.[47]

While the Superior Court scheduled a hearing to consider McKeon's application for pre-judgment remedy and motion for injunction on November 4, 2013, the debtor commenced this case on October 31, 2013, staying the McKeon Lawsuit.[48]

### h. Creation of the Disputed IRA Account

On September 30, 2013, Sharon Brainard deposited a check in the amount of $62,362.12 from her ex-husband's non-qualified pension plan ("Lincoln Funds")[49] into an account in her name at People's United Bank.[50]  Almost immediately she spent a portion of the Lincoln Funds on personal expenses including, without limitation, expenses for her children, attorney's fees to lawyers other than McKeon, automobile expenses, and a life insurance premium.[51]  On October 4, 2013, Ms. Brainard established the Fidelity IRA with a deposit of $40,000.00 of the Lincoln Funds.[52]

By the time the UCC-1 financing statement was filed, the unspent Lincoln Funds were converted into the IRA bank account.

## B. The Chapter 7 Bankruptcy Case and the First Adversary Proceeding

On October 31, 2013 (the "Petition Date"), the Debtor commenced the underlying bankruptcy case by filing a voluntary Chapter 7 bankruptcy petition.[53]  Soon thereafter, McKeon commenced an adversary proceeding against Ms. Brainard seeking a declaratory judgment finding the law firm held a valid and perfected security interest for

---

[47]    ECF No. 364-76; AP-ECF No. 137, p. 127, ln 18-25.
[48]    ECF No. 364-15.
[49]    The court refers to all funds received by the debtor from her ex-husband's non-qualified pension plan as the Lincoln Funds.
[50]    Affidavit of Sharon Brainard, AP 13-2046, ECF No. 103, ¶ 3 (the "Brainard Affidavit").
[51]    Brainard Affidavit, 13-2046, ECF No. 103, ¶ 4.
[52]    Brainard Affidavit, 13-2046, ECF No. 103, ¶  5.
[53]    ECF No. 1.

unpaid attorney's fees as a charging lien against the Lincoln Funds, as well as a temporary restraining order and preliminary injunction preventing transfer or dissipation of the money. [54]  On December 19, 2013, Chief Judge Albert S. Dabrowski (now retired) granted the motion and entered a temporary restraining order and preliminary injunction. At the time, the IRA had an approximate balance of $30,700.00.[55]

### a. Debtor's Assertions of Exemptions

The Debtor initially claimed numerous exemptions pursuant to Bankruptcy Code § 522, including for the IRA she scheduled as being worth $32,000.  In her amended Schedule C – Property Claimed as Exempt, the Debtor listed the IRA and claimed exemption pursuant to Bankruptcy Code §§ 522(a)(3)(C), (a)(4),[56] (d)(5), (d)(10)(D), (d)(10)(E), (d)(11)(E) or (d)(12).[57] ECF No. 32.  Both the Chapter 7 Trustee[58] and McKeon objected, and the court ruled that the Debtor was allowed an exemption in the IRA in the amount of $9,251.18 pursuant to 11 U.S.C. § 522(d)(5).[59]

While the first adversary proceeding was pending, McKeon filed this second adversary proceeding seeking a finding that it held a valid attorneys' charging lien or a perfected security interest against the IRA.  The Amended Complaint here added the legal theory that McKeon held an enforceable assignment of the "assets in the [IRA]".[60]

---

[54]     13-2046 ECF Nos. 1, 2.

[55]     13-2046 ECF No. 10.

[56]     The debtor's amended Schedule C appears to contain a typographical error, in that the debtor purports to assert an exemption in the IRA under § 522(a)(3)(C) and § 522(a)(4), two nonexistent sections of the Bankruptcy Code. The court assumes the debtor is referring to § 522(b)(3)(C) and § 522(b)(4).

[57]     In her amended Schedule C, the Debtor also asserted that the IRA was not property of the estate under § 541(c)(2), and also cited to Conn. Gen. Stat. § 52-321(a). The court does not reach those arguments at this time.

[58]     Initially, Thomas C. Boscarino was the Chapter 7 Trustee for the debtor's estate. However, after Trustee Boscarino's retirement Bonnie C. Mangan was appointed as the Successor Chapter 7 Trustee for the debtor's estate on October 1, 2018.  ECF No. 178.

[59]     ECF Nos. 160, 190.

[60]     AP-ECF No. 1, 9.  The court closed the first adversary proceeding.  13-2046 ECF No. 149.

### b.  McKeon's Proof of Claim

On October 22, 2019, McKeon filed Proof of Claim 1-2 seeking payment in the amount of $83,248.00 based on "Legal Services during divorce & post-divorce obtain non-qual DRO [sic]."[61]  Like the Amended Complaint, McKeon's POC 1-2 asserts that an assignment gave rise to its secured claim.[62]  Attached to POC 1-2 were copies of a Qualified Domestic Relations Order entered by the Superior Court in the divorce case, copies of what appear to be legal bills or partial legal bills, a copy of a retainer agreement, an affidavit by Maria McKeon, copies of emails between Ms. Brainard and Ms. McKeon, a financial affidavit for the divorce case, and a partial copy of a UCC-1 financing statement.  POC 1-2 states the claim is secured, the nature of the property securing the claim is "QDRO proceeds held per court order in Fidelity account," and the basis for perfection is "UCC-1, UCC-3 security interest, atty [sic] charging lien.  Note:  assignment also claimed." [63]  The proof of claim also asserts an annual, post-petition interest rate of 18%, starting thirty (30) days after the date of a billing statement.[64]  On December 20, 2019, the Trustee and debtor objected to POC 1-2, challenging both the amount owed and secured status.[65]

Also attached to Proof of Claim 1-2 a copy of an affidavit apparently filed in the divorce case, including the following description of the work done appears:

> Representation of Sharon Brainard in dissolution action from June 2012 through March 8, 2013 in dissolution action. Extensive discovery including subpoenas of bank records, gambling records, insurance company commissions, IRS records1 Connecticut Department of revenue records, Department of Labor records, telephone interviews of detectives at West Hartford police department, expert who reviewed child pornography on defendant's computer, defendant's employer, various casinos concerning

---

[61]    Trustee Exhibit 16 (ECF No. 358-16).
[62]    POC 1-2, p. 2.
[63]    ECF No. 358-16.
[64]    *Id.*
[65]    ECF Nos. 300, 303.

gambling records, banks, drafting motions of contempt, various discovery requests, faxes and emails to Attorney Sheehan to obtain responses to discovery requests, contacts with IRS to obtain tax records, attending court on various motions for contempt, discussions with water company and emergency motions to deal with water being turned off, attending court on various conferences, including conferences related to GAL fees, emergency calls and regular calls from client concerning defendants [sic] abusive behavior, review of children's records, various meetings with client, various inquiries to track down insurance company commissions, and pension plans and extensive discovery and preparation for trial, dates of trial, and post-trial issues.[66]

## IV.    DISCUSSION AND ADDITIONAL FACTS

### A. The Law Firm Met Its Burden to Establish a Claim for Attorney's Fees

#### 1)    Reasonableness of McKeon's Hourly Rates

Neither the Debtor nor Trustee objected to Ms. McKeon's hourly rate of $300.00. The court concludes McKeon's hourly rate is reasonable, considering her experience, education, number of years in practice, skill as a lawyer, and the rates charged by other attorneys practicing family law in Connecticut.  *See, e.g., Miller*, 2020 WL 4931295 at*7 (approving a $300 hourly rate for family law attorney).

#### 2)    Reasonableness of Time Spent by McKeon

McKeon's POC 1-2 states a claim for $83,248.00 and includes an affidavit of time spent handling the divorce litigation and incomplete timesheets.  While the affidavit includes a lengthy recitation of the types of services performed, the itemized time records filed with POC 1-2 reflect dates, an hourly rate and an amount of time but lack a description of what was done.  Ms. McKeon attempted to supplement the record on the fifth (5th) day of trial with a rebuttal exhibit.  However, Exhibit 364-79, an expanded version of the same time records that included a description of each task performed on each day,

---

[66]    Proof of Claim 1-2, Part 4 (Affidavit of Legal Services filed in divorce case).

was admitted for the limited purpose of attempting to rebut Ms. Brainard's testimony she had not received monthly billing statements.[67]   As Ms. McKeon pointed out during the fourth (4th) day of trial, exhibits submitted by Ms. Brainard (including AP-ECF No. 365-12) and other documents in the record included some of the descriptive language she sought to introduce.[68]   Generally, however, I found Ms. Brainard's testimony that she did not receive regular monthly billing statements from the McKeon firm to be credible.

While Ms. Brainard generally disputes the time spent and opposes allowance of any claim for attorney's fees, the preponderance of the evidence nonetheless establishes substantial legal work related to the divorce litigation was performed.   The time records attached to POC 1-2 include a description of approximately 236 hours through the divorce trial, with an additional amount of approximately 11 hours after the trial.   According to Ms. McKeon's testimony and the affidavit filed with the state court, as supported by the dates and times stated in the attachment to POC 1-2, she performed legal services including gathering facts, appearing at court hearings, making phone calls on behalf of the client to state agencies and opposing counsel, providing legal advice to the client, communicating with a guardian *ad litem* appointed for the children, issuing subpoenas, and other litigation related tasks.   The tasks described are typical of tasks a family law attorney would perform before a contested divorce trial.   After the trial, the parties agree Ms. McKeon spent time preparing, negotiating and obtaining the final, signed QDRO from the state court.

The time entries were recorded in minimum increments of one-quarter hour (15 minutes).   Because the Ms. McKeon failed to include the full billing records on her list of pre-trial exhibits, the court disregards the descriptions of time spent in the billing records

---

[67]     AP-ECF No. 132-3, pp. 247-295; AP-ECF No. 140, p.232.
[68]     *See, e.g.,* AP-ECF No. 139, pp. 137.

except to the extent they appear in other evidence of record.  *See* AP-ECF No. 140, p.232.  Notwithstanding the lack of descriptive billing entries for every time period in the trial record, however, a fairly consistent picture of the legal work that was performed by Ms. McKeon for Ms. Brainard emerged during trial.

While many attorneys would have understood the limits of what Ms. Brainard could afford to pay for attorney's fees early in the case and tailored their efforts accordingly, Ms. McKeon appears not to have done so.  Ms. Brainard, for her part, appears to have hoped – somewhat unrealistically – that she need not pay Ms. McKeon, or that somehow someone else would pay for the attorney's time.  The court notes the retainer agreement between the parties was not signed until the eve of trial, after substantial portions of the legal work had been performed.[69]  The court's task here is not to determine what might have been done differently, but rather is to do "rough justice" for purposes of administering the bankruptcy estate's assets by determining the allowed amount of the claim for attorney's fees.  The law is clear that this is most often done by simply multiplying the number of hours reasonably spent by the attorney by a reasonable hourly rate to determine a lodestar amount.

Here, while the task is complicated by the absence of complete time records, I am persuaded by the record as a whole that Ms. McKeon spent roughly the number of hours she claimed to have spent.  The court accepts that McKeon expended 235.75 hours during the divorce case and 10.75 hours after the divorce on QDRO related work.  Using these amounts the total lodestar calculation for the value of services for divorce related work (235.75 hours x $300.00 per hour) is $70,725.00.  Against this amount, the record supports a reduction of approximately $2,500.00 resulting from payments Ms. Brainard

---

[69]       AP-ECF No. 364-11.

claims to have made, leaving $68,225.00 due.  For the QDRO related services totaling $3,225.00 (10.75 hours x $300.00 per hour), the Debtor is responsible for one- half, or $1,612.50.  The lodestar calculation for both the pre-trial and post-trial divorce work totals $69,837.50 and is presumptively reasonable under applicable Connecticut law.

Considering whether the *Johnson* factors require an enhancement or reduction in the lodestar calculation, I conclude none of the twelve factors require an increase in the lodestar amount, but the lack of detailed time records and the sporadic (at best) monthly statements to the client merit a reduction.  The case did not involve an extraordinary amount of time and labor compared to cases with parties of similar means (factor 1), did not present novel or difficult issues of law or fact (factor 2), did not require a higher level of skill that many family law attorneys possess (factor 3), and was not more complex than many divorce cases.  The case was not so time consuming it precluded other employment (factor 4), and, was of a duration typical of a relatively straightforward divorce case (factor 7).  Factors 6, 8, 10 and 11 do not apply here.  For these reasons no enhancement is warranted.

As for awards in similar cases (factor 12), the court concludes that while the amount sought may be awarded in some divorce cases, the amount should be discounted due to a lack of evidence that the lawyer provided monthly billing statements to the client and the lack of detailed time entry descriptions for all of the time.  There was ample time to complete the record in this regard, but it was not done.  Because the lack of complete itemized time records precludes effective review of the reasonableness of each time entry, a fifteen (15%) percent reduction will be applied, leaving an allowed claim in the amount of $59,361.88.  As noted earlier, Ms. Brainard's pre-petition debts including these attorney's fees, were discharged years ago.  The relevance of this allowed amount is only

so the Trustee may complete the administration of the bankruptcy estate's assets in the Chapter 7 case.

No interest is allowed due to a lack of credible evidence showing the date(s) a statement with a balance due was delivered to Ms. Brainard.

The next question is: how much of the allowed claim is secured by the IRA?

## C. McKeon Failed to Establish an Enforceable Security Interest Under the Uniform Commercial Code

Attachment and perfection are separate and distinct elements under the Uniform Commercial Code. *Kurrus*, 2011 WL 3199469 at *1. "A security interest becomes effective between debtor and creditor when it "attaches" to the collateral, and against third parties when it is "perfected." 1 *Secured Transactions Under the UCC* § 2.02, James Nehf (2017 Revision). Here, neither attachment nor perfection occurred.

### 1)    Attachment Fails for Lack of a Security Agreement

To establish a security interest attached to the funds under Connecticut law, McKeon needed to prove: 1) she gave value to Ms. Brainard; 2) Ms. Brainard obtained rights in collateral; and 3) Ms. Brainard authenticated a written security agreement describing the collateral. Conn. Gen. Stat. § 42a-9-203.[70] McKeon failed to establish the third element.

---

[70]    "[A] security interest is enforceable against the debtor and third parties with respect to the collateral only if:

> (1) Value has been given;
> (2) The debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and
> (3) One of the following conditions is met:
>> (A) The debtor has authenticated a security agreement that provides a description of the collateral …;
>> … or
>> (D) The collateral is deposit accounts, electronic chattel paper, investment property, letter-of-credit rights or electronic documents, and the secured party has control under section 42a-7-106, 42a-9-104, 42a-9-105, 42a-9-106 or 42a-9-107 pursuant to the debtor's security agreement.

Conn. Gen. Stat. § 42a-9-203.

The first element – that McKeon gave value to Ms. Brainard – is established. Despite Ms. Brainard's dissatisfaction with the legal services provided, the record is clear McKeon represented Ms. Brainard during her divorce and provided her with legal services.  Under Connecticut's adoption of the Uniform Commercial Code, the definition of value includes where "a person gives value for the rights [in the collateral] if the person acquires [the rights] … as security for, or in total or partial satisfaction of, a preexisting claim." Conn. Gen. Stat. § 42a-1-204.  McKeon's provision of legal services (even though previously provided) to Ms. Brainard can serve as the "value" required for obtaining rights (*i.e.*, a security interest) in collateral.

The second element – whether [the debtor] Ms. Brainard has rights in collateral – is also satisfied.  "[T]he baseline rule is that a security interest attaches only to whatever rights a debtor may have, broad or limited as those rights may be."  Official Comment 6 to Conn. Gen. Stat. § 42a-9-203.  Conn. Gen. Stat. § 42a-1-201(34) provides that "right" includes remedy.  A review of the status of the Lincoln Funds over time as reflected in the following chart will aid this discussion.

| DATE | EVENT |
|---|---|
| April 5, 2013 | Divorce decree awarded Ms. Brainard seventy percent (70%) of the non-qualified pension plan (which equated to approximately $62,362.12 in funds held by Lincoln at this point in time). |
| July 23, 2013 | State court entered the QDRO directing Lincoln to deliver the Lincoln Funds to Ms. Brainard. |
| September 3, 2013 | McKeon submitted the QDRO to Lincoln. |
| September 18, 2013 | Date of check from Lincoln for $62,362.12 (Lincoln Funds) to Ms. Brainard. |
| September 30, 2013 | Ms. Brainard deposited the Lincoln Funds into her account at People's United Bank. |
| October 4, 2013 | Ms. Brainard established the Fidelity IRA account with approximately $40,000 of the Lincoln Funds. |

Here, Ms. Brainard obtained rights to the funds held by Lincoln on April 5, 2013 pursuant to the divorce decree and, consequently had the power to transfer her interest (whatever it may be) on and after that date.   After Ms. Brainard received the Lincoln Funds, she undoubtedly had rights in the collateral and the power to transfer the rights to a secured party.

The third element – that the debtor (Ms. Brainard) authenticated a security agreement with a description of the collateral – is the problem.  Conn. Gen. Stat. § 42a-9-102(74) defines a "security agreement" as an agreement that creates or provides for a security interest.  Conn. Gen. Stat. § 42a-9-102(74).  A "security interest" in turn is defined as an interest in personal property or fixtures which secures payment or performance of an obligation.   Conn. Gen. Stat. § 42a-1-201.   McKeon relies on a web of email correspondence to establish a supposed security agreement;  no other security agreement exists.  In particular, McKeon identified emails dated June 3, 4, and July 8, 2013.  The following chart summarizes those emails.

| DATE | STATEMENT MADE IN EMAIL |
|---|---|
| June 3, 2013 at 6:29 p.m. | Ms. Brainard stated:<br>"I thought we had already discussed the money due to me regarding the 401k/retirement fund that I was awarded. I discussed thus [sic] with you repeatedly because this was whee [sic] I would get the bulk of payment to you. i [sic] thought you had already started. I stated this during trial and after… When I get money from Peter this week I will give you half. When I get the money from the IRS I will give it all to you – just like last time. …If you do not want to contact the 401k/retirement office, don't. Somehow I will get it done." [71] |
| June 4, 2013, at 1:48 p.m. | Ms. Brainard stated:<br>"The last time we were in court It [sic] was $47,000 with a comment by you that it would not be nearly that amount.  Why don't you go after Lincoln and keep the amount allotted for me and the children for yourself."[72] |

---

[71]    ECF No. 364-72, pp. 1-2.
[72]    ECF No. 364-72, p.5.

| June 4, 2013, at 6:48 p.m. | Ms. Brainard stated:<br>"As I said, go after Lincoln. My families [sic] share should pay your bill, but whether or not you do, as I stated, when my IRS comes in you will receive it and half of whatever Peter gives me." [73] |
|---|---|
| July 8, 2013 at 11:09 p.m. | Ms. McKeon stated:<br>"You have made several statements that I should take the money from the pension payment that the court ordered under the divorce decree.  Pursuant to your instructions, I will take my payments from any pension payments that may be paid from [Peter's] non-qualified pension provided the payments are not delayed until the timeframe that Peter originally elected payments to begin."[74] |

Although the debtor instructs McKeon to "go after Lincoln" and "keep the amount allotted for me and my children," I find this language insufficient – even when considered with all other evidence of record – to create a security agreement.  Other than the email exchanges, the record contains no evidence of authentication by Ms. Brainard and there is no signed writing or further documentation corroborative of the debtor's intent to pledge collateral.   Instead, the language used in the emails is a discussion about how Ms. Brainard could pay McKeon somehow in the future using funds from a variety of sources including – perhaps – the Lincoln Funds, tax returns, or money from her ex-husband.

Ms. McKeon's statement in the July 8th email that she would take "payments from any pension payments that may be paid from [Peter's] non-qualified pension provided the payments are not delayed until the timeframe that Peter originally elected payments to begin" indicates an expectation that Lincoln's payments might be periodic payments rather than the lump sum payment that eventually materialized and might extend far into the future.  But Ms. Brainard's response to this suggestion by Ms. McKeon is not in the record, if there was one.  The resulting silence to Ms. McKeon's suggestion that McKeon

---

[73]     ECF No. 364-72, p. 5.
[74]     ECF No. 364-72, p.6.

"take" payment from any pension payments is not the authentication necessary for the creation of a security agreement.

Importantly, nothing in any of the emails suggests or discloses that by replying to Ms. McKeon's emails Ms. Brainard might be authorizing the filing of a UCC-1 financing statement identifying the Lincoln Funds as the collateral. The lack of authentication evidence – such as a clear statement reflecting Ms. Brainard intended her email discussion to constitute the creation of a security interest for the benefit of her lawyer -- precludes a conclusion that Ms. Brainard intended the various emails occurring on and before July 8, 2013 to serve as a security agreement.

Based on this record, the court concludes no security agreement was created.

### 2)    Perfection Ineffective for Deposit Account

Even if I were to conclude a security interest attached, it was unperfected. After Ms. Brainard received a check for the Lincoln Funds, deposited the check into her personal People's United Bank account, spent some of the money, and used $40,000 to establish the IRA account with Fidelity, McKeon filed a UCC-1 Financing Statement purporting to perfect an interest in collateral described as "Distribution from Lincoln Life Insurance Company Pension Plan in the amount of approximately $62,362.12 distributed on or about September 13, 2013 to Sharon Brainard." But this filing was ineffective. At the time of the UCC-1 filing, the collateral as described no longer existed, the funds had already been distributed, transferred to two different financial institutions, and, in part, spent.

The moment Ms. Brainard deposited the Lincoln Funds check into her account at People's United Bank, the nature of the collateral changed and required a more specific method of perfection. To the extent the distribution became money at any point in time,

the only way McKeon could have perfected it was by taking possession. Conn. Gen. Stat. § 42a-9-313. She never did. By the time the UCC-1 was filed on October 13, 2013, the Lincoln Funds had taken the form of a deposit account (the IRA) rather than an account receivable or a check. In order to perfect a security interest in a deposit account McKeon would have needed control over the deposit account, which she did not have.

Judgment will enter for the defendant on Count 1 of the Amended Complaint.

### D. McKeon Failed to Establish an Assignment of the Lincoln Funds

McKeon bore the burden to establish the existence of an assignment of the right to collect the Lincoln Funds. Generally, to constitute an assignment there must be a purpose to assign or transfer the whole or a part of some particular thing, debt, or chose in action, and the subject matter of the assignment must be described with such particularity as to render it capable of identification. *Schoonmaker,* , 265 Conn. at 227-. Here, McKeon failed to establish that an assignment was ever intended.

It is undisputed that there is no document titled "Assignment" that was drafted by the lawyer and signed by the client. Instead, as described in detail earlier, McKeon relies in large part on email exchanges during the spring and summer of 2013 to memorialize Ms. Brainard's intent to assign the Lincoln Funds, including these two statements by Ms. Brainard:

> "Why don't you go after Lincoln and keep the amount allotted for me and the children for yourself."

> And hours later,

> "As I said, go after Lincoln. My families [sic] share should pay your bill, but whether or not you do, as I stated, when my IRS comes in you will receive it and half of whatever Peter gives me." [75]

---

[75]    ECF No. 364-54 and ECF No. 364-72.

I am unpersuaded these statements – when considered together with the extensive back and forth via email by Ms. McKeon and Ms. Brainard and the other evidence in the present record – set forth a purposeful assignment or transfer of the Lincoln Funds.  At that point, it was clear the Lincoln Funds were to be the only substantial distribution of marital property to Ms. Brainard, because the marital home was in foreclosure with little chance to provide value to Ms. Brainard.  By the time of these emails, the relationship between lawyer and client had utterly broken down, resulting in acrimony and personal animus between them.  Notably, there is a not-insignificant difference in sophistication regarding financial and legal matters between Ms. McKeon and her former client.  With that backdrop, I cannot conclude the statements made in emails volleying back and forth between lawyer and client fairly indicate an intention by Ms. Brainard to make McKeon the owner of the Lincoln Funds.

Judgment will enter for the defendant on Count 2 of the Amended Complaint.

### E.  McKeon Does Not Have a Charging Lien on Debtor's IRA

Applying the *Olszewski* decision that entered during the pendency of the Chapter 7 case here, McKeon does not have a valid charging lien against the funds from the Debtor's ex-spouse's non-qualified pension plan.  In *Olszewski*, the Connecticut Supreme Court held that, "[p]ermitting equitable charging liens against pre-existing assets available for distribution to the parties in marital dissolution actions is inconsistent with the general understanding of a charging lien as an equitable ownership interest in the client's cause of action, which arises out of a property right the attorney is hired to assist the client in obtaining through the process of litigation."  *Olszewski,* 315 Conn 618, at 630.

In *Olszewski,* the court was concerned that an equitable charging lien in a dissolution action would have the same "harmful effect" as a contingent fee agreement,

which is prohibited in a dissolution action by Rule of Professional Conduct 1.5(d)(1).  The court concluded that, "[a]n equitable charging lien therefore could interfere with significant personal interests of the parties, encumber existing assets intended for other purposes, and undermine the mosaic crafted by the court.  Accordingly, public policy considerations did not weigh in favor of recognizing equitable charging liens in marital dissolution actions."  *Olszewski,* 315 Conn 618, at 633.

Since the Debtor's ex-spouse's non-qualified pension plan was already in existence when the martial dissolution case commenced, the *Olszewski* case expressly forecloses McKeon's assertion of a valid charging lien in the Lincoln Funds.

Judgment will enter for the defendant on Count 3 of the Complaint.

## F.  Rule 1.8, Rules of Professional Conduct

The Trustee argues that if a perfected security interest arose, it should be set aside.  Based on these facts, the Trustee argues, Ms. McKeon violated Rule 1.8(i) of the Connecticut Rules of Professional Conduct because she acquired a "proprietary interest" in property owned by the Debtor and failed to inform her client of her right to seek independent legal counsel before doing so.  When questioned by the Trustee, Ms. McKeon acknowledged she did not inform the Debtor of her right to seek independent legal counsel.

> **Trustee:** At any point in time before you did that, did you inform your client or then former client that she had the ability or the desirability to go and get independent legal counsel about her -- before she assigned those rights to you?

> **McKeon:** No.[76]

Some courts have invalidated security interests granted to divorce attorneys in marital assets, concluding such liens are against public policy, based on the principles

---

[76] AP-ECF No. 137, p. 161, ln 1-7.

discussed in *Olszewski* and on the provisions of Rule 1.8.   *See, e.g., Barr,* 2015 WL 4098067 at *10.  Because the court did not find there was an enforceable assignment or security interest, this argument is not reached.

## CONCLUSION

The court has considered all other arguments and finds they lack merit.

This is a final order subject to rights of appeal.  *Ritzen Group, Inc. v. Jackson Masonry, LLC*, 140 S. Ct. 582, 592 (2020).  The time within which a party may file an appeal of a final order of the bankruptcy court is fourteen (14) days after it is entered on the docket.  Fed.R.Bankr.P. 8002(a)(1).

Accordingly, it is hereby

**ORDERED**:  Judgment will enter for the defendant on Counts 1, 2 and 3 of the Amended Complaint, AP-ECF No. 9, and the Clerk shall thereafter close the adversary proceeding case; and it is further

**ORDERED:**  Proof of Claim 1-2 in Chapter 7 bankruptcy case number 13-22251 (AMN) is allowed as an unsecured claim, only, in the amount of $59,361.88, without interest, and is disallowed as a secured claim; and it is further

**ORDERED**: The objections to POC 1-2 by the Debtor and the Trustee are overruled to the extent inconsistent with this Memorandum of Decision and Order After Trial.

Dated this 12th day of August, 2022, at New Haven, Connecticut.



Ann M. Nevins
Chief United States Bankruptcy Judge
District of Connecticut